The Honorable, the Judges of the United States Court of Appeals for the Eighth Circuit Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. Good morning, counsel. The court would like to thank you for joining us virtually. Ms. Rudolph, would you announce our first case for argument? 20-1842 from the Western District of Missouri, Brenda Davis et al v. Michelle Munger 20-1843 from the Western District of Missouri, Brenda Davis et al v. Frederick Covillo 20-1845 from the Western District of Missouri, Brenda Davis et al v. Corazon Health 20-1846 from the Western District of Missouri, Brenda Davis et al v. Advanced Correctional Health Care et al 20-2075 Western District of Missouri, Brenda Davis et al v. Mike Strong et al 20-2076 Western District of Missouri, Brenda Davis et al v. Brian Gross 20-2292 from the Western District of Missouri, Brenda Davis et al v. Brian Gross et al Court will first hear from Mr. Barra. Good morning, your honors. My name is Ken Barra and I represent the individual Buchanan County defendants Brian Gross, Dustin Nauman, former Sheriff Mike Strong, and Jody Hovey. I only have four minutes and short of saying I do when I got married, I'm going to be pressed to get all my arguments in. So I ask you to bear with me and I'll do my best to answer any questions that you have. I'd like to start off with Brian Gross because there are two defenses that we have raised with regards to Mr. Gross. One is official immunity, a state defense, and one is qualified immunity, the federal defense. I would note that I believe that the court ruling by Judge Lowry concluding that Mr. Gross was not entitled to official immunity because his conduct was ministerial, was incorrect in light of the also opinion that is noted in our brief. It's very important to understand that the also opinion indicated that the theory or the defense of official immunity cannot be narrowly construed. I don't think there's any doubt from the record that Brian Gross, the bailiff for the circuit court in Buchanan County, was engaged in discretionary functions with regards to how he discharged his duties while... Counsel, let me direct you. The propositions you cited have been cited for a hundred years. What's the closest case? There are a lot of official immunity cases in Missouri. What's the closest case? Judge, for the concept between the difference of what I believe is discretionary and ministerial, it's the also case. And it was recently decided by the Supreme Court, and I believe that it solidly stands for the position that because Mr. Gross had the right to determine how to discharge his duties, he wasn't acting in a ministerial or clerical component. This wasn't simply dotting your I's and crossing your T's. And I think that's the significance of the distinction between what Judge Lowry pointed out and the also decision. To read it any other way is to construe official immunity too narrowly. Secondly, with the court's permission, I'd like to just touch briefly on qualified immunity. And I want to note this. The argument, the principal argument in support of Mr. Gross is there was no violation of a recognized constitutional right, not one that was clearly established. The sole argument in this case is that Deputy Sheriff Gross did not pay attention to the doctor's testimony. But that does not rise to a violation of the clearly established constitutional right. I'd like to move on to Mr. Officer Nauman, if I could, very, very briefly, because we've raised the issue of official immunity with him. Officer Nauman has been criticized for not entering or accessing prior medical records of Mr. Stufflebee. To that, I would make two notes. Officer Nauman did not have access to those medical records on the computer. And number two, Officer Nauman entered all of the information that was provided to him by Mr. Stufflebee, thus, I believe, bringing him within the parameters of official immunity. Finally, Mr. Berry, isn't that a classic ministerial activity? The entering the information on the farm, the entering itself. But he has to determine how that information is cataloged with regards to that farm. So if Mr. Stufflebee is providing him with information about prior medical condition, medicine, dosage, et cetera, which he did not in this case. Mr. Nauman has to make the determination as to how that information is entered. It's more than just merely clerical decision. Judges, I see my time is up, and I apologize that I could not get to Strong and Hovey. But I'm more than happy to answer any other questions in any rebuttal time. Thank you. Thank you, Mr. Berry. We'll hear from Mr. Hicks. You'll need to unmute your microphone, Mr. Hicks. I've got two buttons I have to hit. All right. Can the court hear me now? Yes. All right. Well, so I'll be very brief. The issue for our two defendants, Ms. Helsall and Ms. Slagle, is whether or not plaintiffs in their second amended complaint pled any allegations that would take this case beyond mere negligence. In my reply brief, I set out exactly what was pled against these two defendants and boiled down that Ms. Slagle is alleged to have called in medications to a doctor. The doctor approved some of those medications, didn't approve others. But there's no allegation that Ms. Slagle didn't follow those orders. And so even if there's some inference that there was negligence, it would be medical negligence alone, certainly not deliberate indifference. Similarly with Ms. Helsall, the allegation there is that she was responsible for training and monitoring other ACH staff. But there's not even an allegation that she failed to do that. If the court infers that there was an allegation that she was negligent in that, again, it's medical negligence. It doesn't rise to the level of deliberate indifference. Mr. Hicks, are your clients even eligible for qualified immunity? I think they are. Let me finish the question. Isn't this a case a little closer to Richardson than it is to Flarsky? Well, I think what I'm relying on in the case law was the Estelle case that said this would be true whether it was the medical director of the facility making a decision in his capacity or the jail staff making the decisions in their capacity. So I don't think there's a distinguish between what the jail staff is doing and what ACH's employees are doing, since what the ACH employees are doing is fulfilling an obligation of the state. Well, counsel, don't all the other circuits, haven't every other circuit addressed this, said that medical professionals that are employed by large, systematic organizations know qualified immunity? I don't know if it's every other, so I can't speak to that. Okay, thank you. And I'll give my time to others that might need it more. Very well, thank you, Mr. Hicks. Next up, we have Mr. Smith. May it please the court, can you hear me okay, your honor? Yes, sir. Yes, we can. Thank you. May it please the court, my name is Wes Smith. I represent Nurse Michelle Munger, who was employed on the state side by Horizon Health, another defendant in this case. With regard to Nurse Munger, the district court made at least two reversible errors. The first being the creation of a separate pleading standard for asserting an individual capacity claim under 1983, dependent on the status of the defendant, which is untenable under the precedent of this circuit. The second error, reversible error committed was with regard to qualified immunity and denying Nurse Munger the say. I should note at the outset, in addressing the court's question, that with regard to qualified immunity and whether this case presents something more along the lines of Filarski or Richardson v. McKnight, we obviously are asserting or arguing that this is more in line with Filarski. And the lawyer v. Kernew, the case of this circuit, wherein a physician was allowed and granted qualified immunity, the Filarski decision... That's the autopsy case from the rural Missouri County you're talking about? That's correct, your honor. Okay, well, that does look, I agree with you, that looks a lot like Richardson, but boy, you have a large, privately-firmed, systematically-organized, major task. Boy, you look like Filarski. Filarski, I would agree with you, your honor. We do look like Filarski in the sense that the control exhibited in this case is not specific and is not a completely systematic, separate institution like you would find in Richardson v. McKnight. Although from Nurse Munger's perspective, she goes to work at a state facility, works alongside state actors, public officials, and is using a state system, a computer system that's provided by the state DOC that she has to interact with. It's an antiquated system, DOF system, that goes down every night for memory server issues. This is not something that's controlled by a systematic private entity. This is a state system within which she is... Who then is her supervisor, or who does she go to if she has a problem or a question? That would depend on the problem or question, your honor. Specifically, the state statutes indicate that the ward of the facility controls the facility and is required to provide the medical care at issue. There's no question that that's a state function. Plaintiffs and appellees would argue that their qualified immediate question only should depend on whether or not it's a public function that one is performing. And I agree with them to some extent, because there's no question in this case that in providing health care to confined inmates, the nursemonger was performing a public function, a governmental function that the state reserve is required to provide under both its statutes and the Constitution. To that end, there's also the other enumerated factors in Filarski with regard to the historical aspect of it, as well as the public policy, both of which favor the application of qualified immunity in this case. Specifically with regard to the historical question, there is no distinction in the common law between a private individual or a publicly employed individual with regard to the application of immunity. We look back to 1871 when Section 1983 was passed. There are simply no cases that are distinguishing between the private and the public individual. And I think Filarski addressed that quite at one point, saying unless you can go back and find a specific case saying, well, this person was only part-time employed or employed on any sort of other basis, therefore immunity shouldn't apply. There's no distinction like that in the historical record. Therefore, it should be that aspect or that factor favors application of immunity in this case. I know the direction from the Supreme Court is that immunity under 1983 should not vary depending on whether an individual working for the government does so as a permanent or a full-time employee or any other basis. That's any other basis. And if you're going to say, well, it's because she's employed by a firm as opposed to individually employed with the state or part-time employed by the state or an independent contractor with the state, that's looking at specifically the basis. Do you want to address the – do you want to address all the other circuits? There's a long string of circuit cases. Well, yes. Other circuits? I would address that this – both the Sixth Circuit, the Tenth Circuit, as you know, probably recently came out with decisions contrary to our position. I really think their historical analysis is not on point. They're basically going back and looking at court case saying, hey, immunity was applied in this circumstance historically. That's not the question that Filarski directs us to ask. The question that Filarski directs us to ask is whether or not there was a historical distinction in the common law between the private and the public servants, the private performing a public service. And that question is no. For those reasons, we would respectfully ask the court to reverse the district court's denial of qualified immunity and the nursemonger's motion to dismiss because we cannot have a separate pleading standard with regard to private or public individuals for which plaintiffs could thwart the application of qualified immunity or the assertion of qualified immunity. My time is up, but I'm happy to answer any other questions the panel may have. Hearing none, thank you, Mr. Smith. Thank you. The court will hear from Mr. Watson. Good morning, Your Honors. If it may please the court, I'm here today on behalf of Dr. Covello. Dr. Covello's sole role in this case was to perform what's called part of an intake and classification process for this inmate. That classification process is mandated by state statute. The state statute directs that the warden of the prison shall designate someone to fulfill this role. It is purely a function of state law to provide for classification of inmates. His total time spent with this particular inmate occurred on October 30th at 9 a.m. in the morning. It was probably completed within just less than an hour of filling out the various forms and necessary paperwork. What he did during that time period was perform a physical examination of Mr. Stuckelbein. He ordered all the medications that he needed, put it in place. He classified him as an M4. The classification system goes from M1 to M5, M5 being the most severe, most involved inmate in the health care system. As an M4, this inmate would have access 24 hours a day to medical care through the TCU. He also, after the classification process, he then contacted his supervisor to try to obtain non-formulary medications for this inmate because of his various health conditions. The plaintiff has alleged in their petition that somehow Dr. Camillo violated Mr. Stuckelbein's constitutional rights. We believe that the lower court erred in denying the motion to dismiss on the question of qualified immunity as well as the motion for summary judgment. And the reason for that is when you look at the pleading itself, what has the plaintiff identified as the constitutionally protected right Mr. Stuckelbein had? Well, there is no right under Forte to this classification at common law. This is something clearly treated as a creature of statute. We did that. He provided for that care. He did the classification. He was gone and not at the facility. In fact, had no further contact with Mr. Stuckelbein. And the record is it is absolutely absent as to any health care concern of Mr. Stuckelbein until into the early mornings of the next day. So on October 30th, the time we saw Mr. Stuckelbein, we provided for his classification. We ordered all his medications. We contacted our supervisor to try to obtain some non-formulary medications for him. And we finished our shift that day and went home. There is no evidence that Dr. Camillo was ever called or contacted. In fact, had no further contact with this inmate. Which then leads to the question, what is, again, what I said, what right did he violate for this inmate? The plaintiff throughout has simply done a, shoved everyone together in steamroll through a series of facts. And what we have suggested to the court and suggesting now is that each one of these defendants have to look at individually. And their conduct judged accordingly. Mr. Watson, would you care to address the question of whether your client is even entitled to immunity? Well, I'd say he definitely is because his role here is he's fulfilling a role. Let me rephrase that. Eligible for immunity at all? Yes, I believe he is. Because, again, he is fulfilling a state function at that point. His role simply in this case is absolutely just to fulfill that state function that's mandated by law. This isn't a discretionary. This isn't a clinic call where the patient, the inmate is being seen for other issues or problems. It's purely as administratively for classification purposes. And no one has suggested that his classification was wrong. In fact, it was an appropriate classification that he provided to this inmate. And the only reason he's there to do this is to fulfill that statute. What about all the circuit cases that go the other direction? Well, I don't believe they go the other direction as to a question like this because those cases don't deal with, in this case, what I would submit as a state actor for the purposes of fulfilling this medical role, which is for classification. The warden, according to the statute. Well, Mr. Watson, let me interrupt you. I thought every one of those cases says that on the one hand they are a state actor, but they don't get qualified immunity. That's what Filarski and Richardson, I think, are all about. So tell me if I'm wrong. Well, I think the purpose here is you have to look at the function, the role that he plays within that. And that's the difference. His role is this administrative role for classification purposes. That's all he did here in this case. This is not a case of denying someone a constitutional right. That's not what this is about. In fact, I don't know that I believe that the plaintiff has identified what his constitutionally protected right is in this case. He simply said broadly that he has a right to have his serious medical needs addressed. And that's all that the First Amendment petition and the Second Amendment petition have alleged. That's it. But the reason that he can't say anymore is because our role is only limited to that classification process. There is no other action he undertook in this case. And the only reason he's doing that is because the state law says you have to have a classification to come into the prison system. I see I'm out of time, and I'll be happy to address any other questions that I hopefully could answer. Thank you, Mr. Watson. Okay. Good morning. I'm Roger Sagan, and I represent Corizon in this Intercollectory Appeal. I'm here to address the issue of Corizon's liability being inextricably intertwined with the motions before the court, or the Intercollectory Appeals before the court of its employees, Dr. Davila and Nurse Munger. We believe that Corizon's appeal is inextricably intertwined with the court's determination of qualified immunity for Dr. Davila and Nurse Munger. To address the court's question as to whether they are even eligible for qualified immunity, I would point out that the U.S. Supreme Court, in the case of West v. Atkins in 1988, indicated that the provision of adequate correctional health care is a non-delegable duty of the state, and so they're clearly acting under the cover of state law. As Mr. Smith pointed out earlier on behalf of Nurse Munger in those briefs, it shouldn't be dependent upon who the employer is. They're undertaking a constitutional requirement to provide adequate health care, and in this case, if you look at the two-step analysis of qualified immunity and determining whether there is a clear basis as to what constitutional right has been violated, I'll point out to the court that we're dealing with a situation where Justin Suffolk came to us with a very rare condition of Addison's disease, was in the facility for less than 48 hours, and as the briefing points out, these were medical decisions that were being made. This is at best a negligence case or a disagreement with the care that's being provided. The plaintiffs' own experts indicate that this is rare and are looking back in a 20-20 hindsight basis to reclassify the care that's being provided. In a factually similar case to this case, this circuit has found that the determination of whether an inmate was properly treated is inextricably intertwined with the correctional facility's qualified immunity defense in the case of Fort Davis v. Faulkner County, Arkansas, in 2014. Additionally, when a ruling on the merits resolves to non-government individuals pending claims, the individual's appeal is inextricably intertwined with qualified immunity in White v. McKinley, and I'd also direct this panel to the case of McCord v. City of Monticello, indicating that Verizon can't be held liable for a constitutional violation if there is no individual constitutional violation that occurred, and there was none here, as detailed in the briefs of both Dr. Cavillo and Nurse Munger. I see I'm out of time. I'm happy to answer any questions and appreciate your comments for me. Hearing none, thank you, Mr. Sleet. The court will hear from Mr. Byrd on behalf of Appellees. May it please the court, counsel, your honors, I think that the Richardson-Filarski question is paramount. Filarski doesn't change Richardson. I believe that Richardson clearly, you know, puts us right on all fours. I know it's not specifically, but you've got a large corporation that's systemically entrenched. It doesn't have supervision over the medical care decisions being provided. And for all those reasons, I think that Richardson controls this. Filarski even recognizes that in its discussion of Richardson. You've got a major lengthy administrative task managing an institution in the prison guard context, but there's really no reason that in the prison health care context it should be any different. Richardson also tells us, if you look at a historical analysis, that the provision of prison services to the public, if you want to call it that, has been shared publicly and privately over time since the 1800s in the United States at least. And I believe so has the provision of medical care through prisons. And so there's not, you don't have a traditional provision of qualified immunity in the private context, and I believe that the case law would support that. Counsel, let me interrupt you. Do we even get anywhere near there? Because this court has a strict rule about how people are sued, and as to Nurse Munger and Dr. Covello, and I think probably by inference, Corison, you did not expressly state you were suing them in their individual capacity at any time. You've amended and had, I've got a whole book here of orders and hearings and all. So they are out of this case from the beginning, right, in their individual capacity. Well, I don't think so, Your Honor. I think that that is mandated by their status as a public official. And so for that reason, I know how to, I know the pleading rule about individual and official capacity. If you look at the allegations against the Buchanan County defendants, who are clearly public officials, I pled it in that manner. And so if they are not entitled to qualified immunity, the Corison defendants, the individual defendants, and they're not public officials, then I don't see why there would be any imposition of a pleading requirement to sue them in their individual versus official capacity. I don't hear any of the defendants stating that if I had sued them in their official capacity, that Corison would be liable as an actor of the state, as an act of the state of Missouri. So I just don't think it was required, Judge. Counsel, we've got a lot of cases. Is there any case of our circuit that favors your position? Well, I don't think that there's a case, Judge, that says that I have to plead it against a private entity. And so I can't give you one that has ruled on that specific issue, and I think that's what Judge Lowry was recognizing, is that if we're going to impose that in this context, that it should be forward-looking rather than retroactive to not. That's the case I'd like to see, whether you put the issue well. Do you have a case where it is retroactively done or not retroactively done? I didn't have a case to cite to you, Your Honor. Well, Counsel, in all the cases that I know of, it's definitely retroactively done because it's argued on appeal, and it was retroactively done at the beginning, so you're stuck with just official capacity, right? Well, Your Honor, respectfully, what I believe is that if that had been done in the context of a private entity providing medical care services, such as in this case, that that would be true if they were entitled to qualified immunity as public officials viewed that way, and I don't believe that there is any case law that has held that. Mr. Byrd, how about Sheriff Strong and Captain Hobie on the issue of qualified immunity? I think they're being sued as supervisors, which would require them having knowledge of a pattern of unconstitutional conduct. Tell me why they're not entitled to qualified immunity. Well, Judge, Your Honor, they were put on notice by two prior lawsuits, the Wilkerson and the Fee lawsuits that the district court recognized and took judicial notice of, and there's a dispute among the parties that I think is important because the defendants continue to say that the Wilkerson case wasn't even against Sheriff Strong and Captain Hobie, and it was at the federal level, and so I've addressed that in the briefing. They actually filed affidavits in opposition to the allegations suggesting that there were systemic problems at the Buchanan County Jail through the provision of such things as medication to the prisoners, failing to take action when prisoners needed medication, and also including the allegations of one of the nurses that's involved in this case, Ann Slagle. So based on those two cases... Well, counsel, surely the number of complaints that are made, surely that can't be noticed to somebody because if you've ever been a public official, you can have thousands of complaints made to you, thousands, counsel, at these kind of facilities, and these didn't result in any judgments, didn't result in any orders, didn't result in anything final. I don't see how you can say they put you on notice of anything except there were two complaints. I think ultimately, Your Honor, the Wilkerson case resulted in a settlement that was reported by ACH, and it's referenced in the briefing. The settlement said nobody admitted any liability, though, counsel, right? It's really against you in the end. Well, I think it's common in settlement agreements, Your Honor, but honestly... Say it again. I'm sorry, I didn't hear what you said. The denial of liability is common in settlement agreements. Yeah, but it also means you're denying the liability. It's part of the settlement, huh? It's called consideration. Go ahead. Your Honor, I can't disagree with that. I see your point. What I believe is you don't pay unless they're afraid that there's going to be liability if it's tried. Yeah. And returning back to... Now, by the way, I know the district court cited a district court case from Minnesota, as I recall. Correct me if I'm wrong. But cited no other authority, at least of this circuit, that you can take account of two lawsuits that didn't result in judgment as some kind of notice of something? Well, I think for notice purposes, Judge, what I provided you... There isn't a case that's specifically on point in this context, but in other contexts, the acceptance of other litigation for notice purposes is pretty broad. That usually comes down in a products liability scenario, and I cited those. I recognize that that's far from where we are here, but it's the best that I can do. And I think for notice purposes that it would apply. And from further towards their knowledge of the situation, Your Honor, to the original question, they also were responsible for attending CQI, which is Continuous Quality Improvement meetings, looking at the CQI reports and participating in that aspect of the oversight and supervision of the medical care services. But I got to ask you, Counsel, the best record here, and I think you make it, is that the CQIs were, your position, fabricated, manufactured, all messed up. So if you're a supervisor and your contractor's giving you fabricated, manufactured, all messed up, that doesn't give you notice, huh? This requires real notice. In their reply brief, Strong and Hobey do throw ACH under the bus on that issue, Your Honor, and I think it's accurate. No, I thought you threw them originally under the bus, Counsel. You're the one that originally threw them under the bus, right? Well, at least you escorted them to the edge of the bus and started the engine, but we won't pursue the analogy. You go ahead. Yes, Your Honor, and what I would tell you is if you look at the CQI reports themselves, they are inconsistent, and there is a problem on their face because there are certain reports that provide information, data on prisoner complaints and medication errors that do not apply in that particular time period. For example, you might see October of 2015 saying that there's none and then November of 2015 saying that there are some, and I'm getting the dates off, but that's cited to you in the briefing. The other thing is the sheriff and the captain, Captain Hobey, were responsible for reviewing prisoner grievances at the same time, and if you are receiving prisoner grievances that indicate that there are multiple medication errors or people not getting their medications and other problems with the nursing staff and you're attending or looking at CQI reports that say that there are none, it's obvious on its face that you have a problem that should be investigated, and so when you take that information and you give it the overlay of the Wilkerson and Fee cases, even though those didn't result in a judgment, I believe that that's enough to show that there was supervisory responsibility and liability here, that they had a systemic problem that they knew would cause serious harm and they failed to address it. All right. Mr. Byrd, how about qualified immunity for Goss, the courtroom deputy? Is really answering one question, whether he believed that Mr. Stuffelbeam was at risk, does that really rise to the level of deliberate indifference when Mr. Stuffelbeam had no symptoms at the time? Well, Your Honor, in the intake screening form, there actually are symptoms reported. It's a disputed fact as to whether those were present or past symptoms, and I think Judge Lowery pointed out they're not in the past medical conditions section, that there's nausea and some other issues that are going on with him. In addition, and I think the most important part, is not whether he had a constitutional duty to be listening, but there are facts and circumstances, a disputed fact issue as to whether he heard the treating physician's testimony, which was extreme. And Gross, of all the defendants, is the one that was present in the courtroom 30 feet from the stand and had at least an expectation that he would be listening for medical issues. Counsel, does the record reflect how far the walk is, the walk is, in feet or something or time, any way you want to tell me a measurement, from that courtroom in the Buchanan County Courthouse to the jail? The record does not reflect that, Your Honor. It is across the street. Yeah. It's in the record. And he walked across the street with this officer, correct, right at the end of the proceeding?  I don't know all the circumstances because it's not in the record. I thought walking was in the record. Walking's not in the record? I think he was escorted, Judge. The manner of the walk, the description of that is not there. There's not a description to the contrary that he was carried across the street either. And I don't think that was the case. I think he got across the street. But he did report medical issues in the intake screening report, and Gross, it's a disputed fact whether Gross did or did not hear what Dr. Brewer had to say, which was this man could die very quickly if he doesn't get his medications. And it's that fact. Counsel, this was a sentencing hearing, correct? Yes, Your Honor, it was. Okay, and as you may know, in Missouri, the judge often has tremendous discretion in sentencing. That was undoubtedly directed toward length of sentence, I bet, right? And top. But I believe that it was. The doctor did not believe that Mr. Stuffelbein would be able to get his medications or get the appropriate medical treatment if he was incarcerated. And it's foresight. Yeah. So it's that, to me, Judge, it's that, Your Honor, it's that knowledge for disputed fact as to knowledge by Gross that triggers his responsibility because he does have a constitutional duty that he admits that he is supposed to report medical condition if he is aware of it. And he did not deny that he heard Dr. Brewer's testimony. He just said, I can't remember. And for Judge Lowry, there was sufficient information about proximity, about the nature of the crime, about the nature of the testimony by Dr. Brewer that would have put him on notice, along with the medical conditions that actually did end up in the intake screening report. There's a whole lot of ground, Your Honors, that I've had to cover. And what I think is easiest is if there are issues that you would like addressed specifically, it's been helpful to have you dive right in there. But if you want me to pick it up, I'll go next. Let me dive in. How about let's go back to Gross on the official immunity question. Yes, sir. Isn't his responding to the question about his belief, isn't that sort of a discretionary issue as opposed to a ministerial one? Well, I don't think that the question is, well, Your Honor, I don't want to misstate the record, and I'm not looking at the form for the question. What I think is if you've heard that testimony and you're asked, does the prisoner have a medical condition, that you need to answer it directly. My recollection, I could be wrong as well, but my recollection is that the question was, do you believe that the prisoner is at risk for some medical concern, medical condition, not does he have a particular medical condition? And so believing that somebody is at risk, isn't that sort of a classic discretionary decision? It's not like reporting a list of symptoms that are known to you. I agree with you, Your Honor, but I guess what I would tell you is that if you're asked that question and if you've heard the testimony of Dr. Brewer, aside from the questionnaire itself, you have a constitutional duty to report a serious medical condition, and that is not reported, regardless of the form. But I think the more that you quote it, I think you're right that the form asks if the officer believes it. Well, on discretionary versus ministerial, there are a lot of Missouri cases. Court of Appeals have a lot of cases in Missouri. What's your closest case that tells us this is discretionary or ministerial? You know, Your Honor, when you asked that question to Mr. Barra, I figured that question was coming my way, and I don't have a citation for you, and I'm embarrassed to admit it, but that's the fact. Is this like the Rolex watch case? Do you know about the Rolex watch case, Lee's Summit, Missouri? I'm not familiar with it. Okay. Thank you. I wanted to address the issues that Mr. Watson raised with regard to Dr. Cavillo. He's attempting to get around the qualified immunity holding that I believe controls, which is Richardson. And by stating that the action at issue is the classification of Mr. Stufflebean into the system. And while it is true that that is one aspect of his duties, the constitutional issue is whether he provided appropriate care, knowing that there was a serious medical issue and that there were problems, and whether he gave Mr. Stufflebean his medications. Those issues are all disputed facts. You've been provided with the record on it. And so I think that it's a nice way to try to draw us into, he was just carrying out statutory duties, et cetera, versus providing medical care. And the fact is he does claim that he prescribed the medications, but he doesn't tell who he told to give them. The record is in discord about when he actually wrote the prescriptions for and when they were supposed to be given. And under all those circumstances, along with the electronic medical records reference to Mr. Stufflebean having problems, reported problems from the very beginning of his incarceration and Dr. Cavillo's failure to look at the electronic medical record in conjunction with understanding that Mr. Stufflebean needed his medication that day, all drives Judge Lowery's decision. Let me ask you this, counsel. Just listening to you the last minute or two, describe it. It sure sounds like a good malpractice case. A heck of a malpractice case. And you have a wrongful death going, right? There's a wrongful death case going here, right? But tell me, boy, there is the documentation. You say it's a day late. I understand that. But there is the documentation about the prescription and documentation about the care and all that. How does that get anywhere near deliberate indifference? Give me just a second. Sure. I'm going to be talking very quickly as soon as I find the case. It comes from a couple of decisions from you, Judge. And one is the McRaven versus Sanders case, 577F974, which regards medical staff negligence, where you indicate that medical treatment may deviate so far from the standard of care that it amounts to deliberate indifference. And that case involved blood pressure readings. You were discussing the liability of a nurse. I see that I'm out of time. Would you like me to continue or just stop? Well, you can finish your thought, Mr. Byrd. You're looking at the liability of a prison nurse in McRaven versus Sanders, Your Honor. And what you indicate is that the nurse had contradictory testimony, testimony that he had checked on the blood pressure multiple times for this man who was in distress. And then the videotape contradicted him checking on the blood pressure. You have those same factual contradictions in both Dr. Cavillo and Nurse Munger's reports in the record about what they were doing. And furthermore, you indicate that the nurse did not consult available tests at the time. Both Nurse Munger and Dr. Cavillo failed to look at the electronic medical record that was available at the time in order to make appropriate decisions to get this man his medication that day. There's also an analysis by you and Forte and Faulkner that goes along those same lines, which is that if somebody needs their medication for a serious medical condition, that it should be provided timely. And I know in Forte versus Faulkner, there was a delay after a prescription was given, but there was no showing of causation that the delay had done anything. So in this case, the delay in providing this man, his medications caused his death. Very well. Thank you, Mr. Bird. Thank you, Promise. Ms. Rudolph, do the appellants have any rebuttal time remaining? And have they designated one particular attorney to handle that? They have actually used all of their time. Very well. Had they... Go ahead. I'm sorry. They did not designate anyone in particular to do rebuttal. Very well. Then I think unless any of our judges have a particular question aimed at a particular attorney, I think we'll deem the case to be submitted and we'll issue an opinion in due course. Thank you, counsel. We appreciate your appearance today. It was a little difficult to allocate the time, but I think we were able to get in our questions. So thank you all for your appearance. Thank you, Your Honor.